# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**HOME DESIGN SERVICES, INC.,**
                              **Plaintiff,**

**-vs-**                                          **Case No.  6:03-cv-596-Orl-28DAB**

**SCHWAB DEVELOPMENT CORPORATION,**
**d/b/a Schwab Custom Homes,**
**WILLIAM D. KLEIN,**
**MICHAEL P. SCHWAB,**
                              **Defendants.**
_____

# ORDER

This cause is before the Court on Plaintiff Home Design Services, Inc.'s ("HDS")

Renewed Motion for Continuance of Trial, for Mistrial, or Other Relief (Dkt. 161) and

Defendants' Motion to Dismiss (Dkt. 167).

## I. BACKGROUND

The facts giving rise to the pending motions are highly unusual.  HDS is a company

that designs, publishes, and sells house plans.  Mr. James Zirkel ("Mr. Zirkel") is the majority

shareholder of HDS and his wife owns the remaining shares.  Mr. Zirkel is also the president

and manager of HDS and has acted as the corporate representative in this case and others

before this Court.  Over the past several years, HDS, under the direction of Mr. Zirkel, has

filed at least thirty-nine cases in the Middle District of Florida claiming violations of HDS's

rights under the Lanham Act.[1]  Most of these cases have resulted in settlement.  This case,

_____

[1]  The parties disagree as to the exact number of cases that HDS has filed.  The Court
derived its count of thirty-nine from the records of the Middle District.

however, proceeded to jury trial on May 23, 2005.

On the first day of trial, the Court selected and swore a jury, both sides made opening statements, and HDS examined Mr. Zirkel.  Much of HDS's opening statement was objectionable including counsel's representation that Mr. Zirkel had designed houses for celebrities in the Orlando area.[2]  Worse was counsel's highly inappropriate and partially incorrect remark that "[w]e've actually done houses for the judiciary here, Judge Conway, Judge Presnell, both federal judges."  Trial Tr., May 23, 2005, Dkt. 156 at 82-83.  At the conclusion of counsel's opening statement, the Court addressed the propriety of counsel's references to Judge Conway and Judge Presnell:

> COURT: Are you going to put on evidence that your client designed Judge Conway's house?
>
> HDS COUNSEL: We can.
>
> COURT: You told the jury that was true.
>
> HDS COUNSEL: Yes.  Judge Conway's husband is one of our clients, yes.
>
> COURT: And you believe that you designed her house?
>
> HDS COUNSEL: Actually, I may have misspoke that.
>
> * * *

---

[2]  Counsel remarked as follows: "Home Design Services has built houses for people you've heard about.  Tim Raines of the White Sox, Frank Viola of the Minnesota Twins, Chet Lemon of the Detroit Tigers.  On the Orlando Magic, Reggie Theus, Dennis Scott, Greg Kite, Otis Smith, Ron Coppenberger of the Atlanta Falcons.  The gold medal Olympic gymnast, Brandy Johnson.  The actor Robert Vaughn.  Princess Mahi and Prince Naif of Saudi Arabia.  Locally some of you may have heard of Mr. Real Estate, Edward Huskey, we designed his house, Home Design did.  Robert Vincent Sims, the garden rebel, we did his house."  Trial Tr. May 23, 2005, Dkt. 156 at 82-83.

COURT: Was it appropriate to inject the judiciary into your opening statement when you didn't plan to put any evidence on to that effect? And if you had, it would have been incorrect, it would have been wrong evidence?

HDS COUNSEL: I did plan, but I misspoke about–

* * *

COURT:  How do I correct the situation with Judge Conway now?  You've told the jury not only something that you did not intend to prove, but something that's false.

* * *

COURT:  I cannot believe you would inject the judiciary into your opening statement.  I mean what is the purpose, to get the judiciary on your side of the case?

HDS COUNSEL: No.  It's just people that are prominent to show that we are not a hack designer, that we do things for important people, that we are, have been around for a long time and have a tradition.  I considered it background.

Dkt. 156 at 98-100.  Following this exchange, the Court returned the jurors and instructed them to disregard counsel's reference to Judge Conway and Judge Presnell.

During his opening statement, HDS counsel also made references to the costs borne by Mr. Zirkel in bringing this case against Defendants.  This led to defense counsel's argument at the conclusion of the first day of trial that HDS counsel had opened the door for inquiry into HDS's contingency fee and court cost arrangement with HDS counsel.  The Court agreed and ruled that defense counsel could inquire into the arrangement on cross-examination of Mr. Zirkel.  Doc. 156 at 228-29.

After the conclusion of opening statements, HDS called Mr. Zirkel as its first witness.  On direct examination, Mr. Zirkel provided approximately three-and-a-half hours of testimony, much of which went to matters irrelevant to HDS's copyright claims, such as Mr.

Zirkel's church involvement and charitable works:

HDS COUNSEL: What about socially, are you involved in church at all?

MR. ZIRKEL: Very involved in our local church, Christian Missionary Alliance Church. Sunday school teacher, my wife and I teach a three and four year old class. Been a deacon and an elder and also church board member. Several years ago I was involved with International Cooperating Ministries where we toured Cuba and seeded churches in Cuba, and my wife and I, and through that ministry, financed and built a church in India through International Cooperating Ministries.

* * *

HDS COUNSEL: You paid for part of the construction?

MR. ZIRKEL: We paid for the church.

HDS COUNSEL: Okay.  What other involvement do you have with your church?

MR. ZIRKEL: Presently I'm the leader of a care group [that] takes the place of Sunday night meetings.  Our church is broken up into small groups and we do Bible studies in these care groups so the people are, you know, taken care of better than just the church meeting on Sunday night.

* * *

HDS COUNSEL: [Please explain] your involvement with the Habitat for Humanity . . . .

MR. ZIRKEL: We were requested by one of our publishers, HomeStore.com, if we would provide [] Habitat for Humanity pro bono plans, so we prepared, for Habitat for Humanity four different size plans from 800 square feet to 1100 square feet for the program that could be built across the country.

HDS COUNSEL:  When you say you provided them, what do you mean?

MR. ZIRKEL: We designed them, we turned them over for free for Habitat for Humanity to use anywhere in the country they wanted to use them.

HDS COUNSEL: Didn't charge them a fee or keep a copyright license or anything like that?

-4-

MR. ZIRKEL: No sir, we did not.

Dkt. 156 at 119-20, 127-28.

Direct examination of Mr. Zirkel concluded on May 23, 2005.  The next day, immediately before Mr. Zirkel's cross-examination was scheduled to commence, HDS moved for a mistrial.  While urging the Court that the case could not continue, HDS's counsel explained: "[Mr. Zirkel] has just passed a note that he is sick and he's not sure that he can physically continue.  And I think it's because of his medical condition, but I have not spoken to him."[3]  Trial Tr., May 24, 2005, Dkt. 157 at 236-37.  Out of the jury's presence, the Court made inquiry into Mr. Zirkel's sickness:

> COURT: Well, you better talk with Mr. Zirkel.  Where's his doctor?
>
> HDS COUNSEL: I don't know your honor.  He's still under oath, so I have not even spoken to him.  This is the only note I got.
>
> COURT: Talk to him and ask him two things.  Ask him what he means by the note, what's involved here, and then ask him who is doctor is.  This is a very expensive undertaking to start a case in federal court.  I don't have the luxury of moving it off a week and picking it up and I don't think it would be fair to this jury to tell them to go home and come back two weeks from now, although I'm not going to foreclose that possibility, if he really needs medical attention.  So go ahead and talk to him.
>
> (DISCUSSION OFF THE RECORD.)
>
> * * *
>
> HDS COUNSEL: Dr. Hilal is the doctor's name, he works out of Maitland . . . .  He's Mr. Zirkel's specialist.  This is what Mr. Zirkel tells me, I hope I have it correct.  He's on a cycle of medication for the chemotherapy, which includes six pills or so that he takes on a regular basis, sounds like it's every two or three days thereafter he's completely out of business.  He has rearranged his

---

[3]  Prior to relaying the contents of Mr. Zirkel's note, HDS asserted two other grounds for its motion for mistrial, both of which the Court ultimately found wanting.

cycle.  He was going to take them on Friday, but he would have been out of business Saturday and Sunday and would not have been working very well today and then would have had to take them again tomorrow.  Instead, what he did, he pushed it back.  He took them on Wednesday.  He's been without his pills for we're talking four or five days now.  He's taken one or two, but he needs to take that whole cycle of poison, as you will, because his body is now reacting to it and . . . the way he put it, in about 20 minutes his body's going to shut down and he's going to lay down on the courtroom floor.

COURT: It sounds like he's familiar with the problem.

HDS COUNSEL: I'm sorry your honor.  I didn't mean to interrupt.

COURT: He knows what's going to happen next.

HDS COUNSEL: He was trying to plan a cycle so he could be as aware and acute and capable of performing and this is the first time that he's tried to plan a cycle–

COURT: So what you're telling me is he probably won't be able to try any of his cases for the foreseeable future.

HDS COUNSEL: I don't know your honor.  This is news to me.

COURT: You better find out if you're asking me to declare a mistrial on that basis.

* * *

HDS COUNSEL: I'm happy to get the doctor on the phone your honor and find out if we're in the medical cycle and if there's a way to get around it.  I don't know, I'm not sure.  I'm happy to provide an affidavit from the doctor.  We can see if it may be possible to continue the trial briefly.  I don't take any pleasure in doing this your honor.

COURT: I assume you'd be willing to pay for the cost of the venire coming if this is something that you knew about and is likely to happen and given the circumstances of this coming up just before cross examination.

HDS: I would–well, I guess the first question would be how much are we talking about, but certainly this is not something that I knew about or Mr. Parrish knew about it or we anticipated happening.

Id. at 238-241.  Soon after this exchange, the Court excused one of the attorneys for HDS

to drive Mr. Zirkel to the hospital.  Defense counsel then expressed his desire that the Court

continue the trial rather than declare a mistrial, whereupon the Court returned the jurors and

informed them that the trial would be temporarily continued pending a hearing to determine

the status of the case.  Id. at 245.  The Court denied HDS's motion for mistrial but did so

without prejudice and with leave to reassert the motion.

On May 27, 2005, the Court held a status conference during which HDS reasserted

its motion for mistrial and, alternatively, moved for a continuance of the trial until such time

as Mr. Zirkel completed his treatment for hepatitis C.  In support of its motion, HDS submitted

a letter from Mr. Zirkel's doctor, Talal E. Hilal, M.D. ("Dr. Hilal"), a gastroenterologist who had

been treating Mr. Zirkel.  In his letter, Dr. Hilal noted that the side effects of Mr. Zirkel's

treatment were very serious and concluded that:

> Mr. Zirkel is not fit to participate in trials or other activities where he is to be
> held accountable for his statements until the end of [his] treatment.  Other
> aspects of these cases may proceed, if you wish, but not those involving the
> patient.  When the treatment cycle is complete, I anticipate that Mr. Zirkel will
> be fully recovered and able to resume his normal activities.

Letter from Dr. Hilal, May 27, 2005, Dkt. 149.  According to Dr. Hilal, Mr. Zirkel's treatment,

which began on January 7, 2005, would take eleven months to complete and thus was

tentatively scheduled to conclude sometime in November 2005.

In response to HDS's motion and Dr. Hilal's letter in support, counsel for Defendants

argued as follows:

> Obviously this, if it's been going on since January 7, 2005, at some point I
> would have notified either the Court or myself that Mr. Zirkel's cognitive abilities
> are impaired.  I know Mr. Zirkel has signed declarations and submitted to the

> Court in other cases since January 7, 2005.  We've gone through two [pretrial conferences] [in] this case alone without even a mention of Mr. Zirkel's alleged cognitive abilities being in question.  And he went through half a day of direct testimony . . . where he was asking a jury to rely upon his credibility and his cognitive abilities in seeking damages from my client.  Nowhere in this letter does it suggest that this particular treatment has any effect on his cognitive ability.  The letter talks about various treatment side effects that could occur, but nothing addresses whether they have, in fact, occurred as to Mr. Zirkel . . . .  I would strongly object to any further continuance beyond June 14 or any mistrial.  We've gone this far without any suggestion from any party that Mr. Zirkel had any medical conditions that would impair our ability to go forward.

Tr. of Tel. Conference, May 27, 2005, Dkt. 158 at 8-9.  The Court similarly noted that, after much observation of Mr. Zirkel during the proceedings in this and other cases: "There was nothing that indicated that Mr. Zirkel lacked mental acuity . . . nothing to indicate that his memory was flawed . . . nothing to indicate that he was ill at all except that his complexion was sallow and at one point he asked for a drink of water."  Id. at 14.  The Court also expressed the concern that HDS might have been attempting to exploit Mr. Zirkel's sickness in order to avoid cross-examination into Mr. Zirkel's character, a rather likely prospect given that Mr. Zirkel had testified to his church activities and other matters bearing on his character during direct examination.  Id. at 15.  In accordance with its own concerns and those of defense counsel, the Court denied HDS's motion for mistrial or for continuance and set trial to reconvene on June 14, 2005.

On June 10, four days before trial was scheduled to reconvene, HDS filed a renewed motion to continue or for mistrial (Dkt. 161).  HDS had previously failed to provide competent evidence that Mr. Zirkel was suffering from cognitive deficiencies that rendered him unable to continue his participation in the trial.  However, in support of its renewed motion, HDS filed a declaration by Dr. Hilal attesting to Mr. Zirkel's condition which, unlike the letter that Dr. Hilal

prepared in support of HDS's original motion, was based on a contemporaneous personal examination of Mr. Zirkel.   In addition, HDS submitted Mr. Zirkel's medical records. Defendants not only opposed HDS's motion but also moved *ore tenus* to dismiss HDS's complaint or, alternatively, to strike the testimony that Mr. Zirkel provided on direct examination (Dkt. 167).  On the eve of trial, the Court held a hearing on the parties' motions. At the conclusion of the hearing, the Court determined to take the parties' motions under advisement and proceed with trial the following day.

With the vice president of HDS, Russell Kingman ("Mr. Kingman"), standing in place of Mr. Zirkel as the corporate representative of HDS, trial resumed on June 14, 2005. However, less than an hour into the day's proceedings, it became clear to both parties and to the Court that none of Mr. Zirkel's prior testimony could be relied upon and that the case could not proceed in the absence of Mr. Zirkel.  Accordingly, the Court released the jury from further duty and scheduled an evidentiary hearing on June 17, 2005 to determine whether to dismiss HDS's claims on the basis that HDS and its attorneys committed fraud upon the Court or, otherwise, to determine how and when to proceed with the case.

## II.  EVIDENTIARY HEARING

On June 17, the Court heard evidence from both parties regarding the circumstances surrounding Mr. Zirkel's alleged inability to participate in this case during the period between his direct examination by HDS counsel and the termination of his treatment for hepatitis C. To be sure, the Court's inquiry was not into whether Mr. Zirkel suffers from a serious illness. Notwithstanding intimations by HDS counsel to the contrary, that fact has never been in

dispute.  Rather, the Court's focus was and remains on the degree to which Mr. Zirkel and

HDS counsel have engaged in abusive litigation practices.

At the June 17 hearing, HDS called the following witnesses: (1) Janice Zirkel ("Mrs.

Zirkel"), Mr. Zirkel's wife; (2) Andrea Joyce Rosenberg Lewis ("Ms. Lewis"), HDS's

bookkeeper and director of marketing; and (3) Dr. Hilal.  Defendants called: (1) Mr. Kingman;

(2) Seth Calhoun, Sr., a former employee of HDS; and (3) Michael Schwab ("Mr. Schwab"),

the President of Defendant Schwab Development Corporation.

### A.  HDS'S WITNESSES

### 1.  Mrs. Zirkel

On direct examination, Mrs. Zirkel provided extensive testimony as to the side effects

that Mr. Zirkel had endured while receiving treatment for his illness over the course of the

prior five months.  When asked whether Mr. Zirkel could endure a "five or seven day

continuous trial" in light of Mr. Zirkel's various symptoms, Mrs. Zirkel replied:

> No, he cannot.  He's not, I don't believe he's mentally able to process what is
> going on in a clear and coherent manner.  I don't believe he's emotionally able
> to handle the anger or the depression that may come as a result of it, and I
> don't believe he's physically able to–he would need to be near a restroom and
> be able to take care of himself should he have to.

Tr. of Evidentiary Hearing, June 17, 2005, Dkt. 182 at 28.

Mrs. Zirkel's unequivocal assessment of Mr. Zirkel's condition was severely

undermined by her testimony on cross-examination.  While insisting that Mr. Zirkel could not

endure the rigors of a trial scheduled to last approximately one week, Mrs. Zirkel testified

that, since receiving treatment, Mr. Zirkel regularly drove his car, worked an average of 20

to 30 hours per week, authorized the sale of HDS's production department, and, most

significantly, actively prosecuted this and numerous other lawsuits.  Although Mrs. Zirkel

emphasized that the worst of Mr. Zirkel's symptoms occurred over the previous two months,

her testimony revealed that, even after Mr. Zirkel's episode on May 24, 2005, he traveled by

car to North Carolina for vacation and signed a settlement agreement in one of the many

cases that HDS has filed in this district.  Defense counsel also asked Mrs. Zirkel whether her

husband participated as a judge in the Volusia Home Builders Association Parade of Homes

competition on April 15, 2005.  While she replied that she could not remember whether it was

her husband or Mr. Kingman who did so, Mr. Kingman later confirmed that it was Mr. Zirkel.

See infra.

### 2. Ms. Lewis

Ms. Lewis's testimony on direct examination focused on the symptoms that Mr. Zirkel

had been experiencing since his treatment.  On cross-examination, Ms. Lewis testified to her

belief that Mr. Zirkel was still able to distinguish between right and wrong and provide honest

testimony.

### 3. Dr. Hilal

In Dr. Hilal's declaration in support of HDS's motion for mistrial or continuance, he

stated that Mr. Zirkel suffered from "serious thinking and cognitive abnormalities" and thus

could not "be held responsible for what he [said or did] while undergoing treatment."  HDS's

(Motion to Continue Renewed Trial, for Mistrial, or Other Relief, Dkt. 161, Ex. A.)  Dr. Hilal

further volunteered that, "as a [gastroenterological] specialist," he could "state, without a

doubt, that Mr. Zirkel [was] not fabricating any part or portion of his condition, or any of the

symptoms [that he had been exhibiting]."  Id.  At the June 17 hearing, Dr. Hilal reiterated the

assessments contained in his declaration and also testified that it would be "medically dangerous" for Mr. Zirkel to participate in the trial while receiving treatment, such that if he "cracks . . . he may . . . actually go into deep depression and . . .commit[] suicide or kill[] someone in the courthouse." Id. at 134-35.

Dr. Hilal's testimony on cross-examination proved valuable in two ways. First, Dr. Hilal diminished the value of much of his earlier testimony by acknowledging that his assessment of Mr. Zirkel's psychological state was outside his area of expertise and that his diagnosis of Mr. Zirkel's symptoms was based mainly on self-reporting by Mr. Zirkel. Id. at 130-31. Second, Dr. Hilal provided an account of his communications with Mr. Zirkel and HDS counsel which belied the contention of counsel that the extent of Mr. Zirkel's medical condition was "news" to them.

Dr. Hilal's testimony revealed that, on April 25, 2005, Mr. Zirkel contacted Dr. Hilal to request that his medical records be released to HDS counsel. Mr. Zirkel's request contained a long handwritten note which stated, in pertinent part, "We need to postpone a court date (I am the Plaintiff) . . . . [P]lease allow . . . my copyright attorney any and all information regarding my treatment and condition. [My lawyer] needs [a] letter dictated about side effects[,] mood swing[s], memory loss[,] and [impaired] ability to make decision[s]." Dkt. 162, Ex. A. The record reveals that Dr. Hilal initially prepared a brief letter stating that Mr. Zirkel's "ability to make decisions will be impaired" and that Mr. Zirkel had been "advised . . . to . . . postpone the trial until he is off medication."[4] Dkt. 162, Ex. B. Yet, that same day, Mr. Zirkel

[4] Dr. Hilal's notes reflect that his last examination of Mr. Zirkel prior to writing the April 25 letter took place on April 11, 2005. At the conclusion of that examination, Dr. Hilal did not

informed Dr. Hilal that "our attorney feels this letter is not descriptive enough of Jim's real problems in a court room situation" and requested that Dr. Hilal "rewrite [and] elaborate on [a] list of [attached] questions."  (Hearing on Plaintiff's Motion to Continue Renewed Trial or for Mistrial and Defendants' Motion to Dismiss, June 17, 2005, Dkt. 176, Pl.'s Ex. 6.)  HDS maintains that, in the month prior to trial, Dr. Hilal never provided the letter that Mr. Zirkel and HDS counsel requested.  More important than that, however, is the fact that, in that same time span, neither Mr. Zirkel nor HDS counsel ever brought the matter of Mr. Zirkel's health to the Court's attention.

### B.  DEFENDANTS' WITNESSES

### 1.  Mr. Kingman

On direct examination, Mr. Kingman testified to three important matters.  First, Mr. Kingman testified that, although he had been authorized to enter into settlement agreements on behalf of HDS, he had never actually signed a settlement agreement or even been involved in the final outcome of a settlement.  Rather, HDS entered into all of its settlement agreements under the authority of Mr. Zirkel, including an agreement that Mr. Zirkel authorized on June 8, 2005, a little more than two weeks after Mr. Zirkel claimed that he could not continue on in this case.  Second, Mr. Kingman testified that, sometime in April 2005, he expressed concerns about Mr. Zirkel's health to HDS counsel, once again undermining the contention of HDS counsel that Mr. Zirkel's ill health was "news" to them.  Finally, Mr.

---

check the space on his medical chart indicating that Mr. Zirkel was suffering from abnormal thoughts.  Indeed, the first time that Dr. Hilal indicated that Mr. Zirkel was experiencing abnormal thoughts was on May 11, 2005, and the doctor cannot recall what those abnormalities were.

Kingman testified that Mr. Zirkel participated as a judge in the Volusia County Homebuilder's Association Parade of Homes competition on April 15, 2005, over a month before trial in this case began and during the period in which Mr. Zirkel's health problems were supposedly worsening.

### 2. Mr. Calhoun

Mr. Calhoun, who had been employed by HDS's production department for three years, testified that he had no reason to doubt Mr. Zirkel's mental abilities during the time leading up to Mr. Zirkel's decision to sell HDS's production department. Dkt. 182 at 88-90. Mr. Calhoun also testified that Mr. and Mrs. Zirkel had set up a system at HDS for avoiding process servers. Id. at 91. According to Mr. Calhoun, if Mr. or Mrs. Zirkel suspected that they were being served, they would simply leave the building through the backdoor. Id. at 92. Mr. Calhoun specifically testified that on at least one occasion he observed Mrs. Zirkel leaving the building to avoid service of process.[5] Id.

### 3. Mr. Schwab

The record plainly indicates that, on May 16, 2005, Mr. Zirkel traveled to the offices of Schwab Development Corporation in Melbourne, Florida for the purpose of viewing Defendants' files. Mr. Schwab testified that, while there, Mr. Zirkel "went through each and every job file that [Schwab Development Corporation] had dating several years back." Dkt. 182 at 95. According to Mr. Schwab, this took approximately three hours, during which time Mr. Zirkel took no breaks and showed no signs of discomfort. Mr. Schwab also testified that,

---

[5] Mrs. Zirkel earlier testified that she had no knowledge of any such system for avoiding process servers.

on the morning of the day that Mr. Zirkel claimed that he could not continue on in this case due to ill health, he observed Mr. Zirkel walking up the stairs to the entrance of the courthouse at a "very quick pace" and, thereafter, pacing up and down the hallway outside the courtroom while preparing for trial. Id. at 96.

### C. COURT'S FINDINGS UPON CONCLUSION OF THE HEARING

After hearing closing arguments from both parties, the Court made the following findings:

> [Mr. Zirkel's] demeanor and his responses, his obvious involvement in the trial and pretrial matter leading up to the trial . . . certainly did not put the Court on notice of any mental impairment.  On the contrary, [Mr. Zirkel] answered completely [and] was articulate.  He maintained extremely good eye contact with the jury throughout.  He asked to get up at one point and go to the podium to explain his testimony [and] was at all times clear and coherent.  There were objections or admonishments by the Court only to cease the narrative responses to questions because [Mr. Zirkel's answers] sometimes went well beyond the question [asked] . . . .  I assume that if counsel had seen a problem it would have been brought to the Court's attention.

> Now, I do find that Mr. Zirkel suffers from hepatitis C, which I believe to be a serious illness, and that he is under medication for that illness and that the medication causes physical problems that have been described.  I don't know that I can make a finding as to the extent of the problems.  Again, [notwithstanding] my own observations of the Defendant and having heard some of the descriptions of [Mr. Zirkel's] activities outside of the courtroom, . . . I think to one extent or another [Mr. Zirkel] suffered from the physical side effects that Mrs. Zirkel described and [that Dr. Hilal] described.

> On the other hand, there's no . . . reliable evidence before the Court indicating that [Mr. Zirkel] suffered from any inability to process events sequentially.  There's no reliable evidence before the Court that he could not articulate logical progressions.  And there's no evidence before the Court that he could not make serious decisions.  And all evidence before the Court indicates that he knew the difference between truth and untruth.

Dkt. 182 at 179-180.  The Court then concluded the proceedings with the following instruction

to counsel: "There's no question that this case should not have proceeded and there has to be a responsibility for that.  The Court's concerned only as to what remedy should be imposed, what cost[s] should be imposed, and the law with regard to whether the Court should dismiss this case altogether."  Dkt. 182 at 183.

Upon further consideration of the testimony presented by both parties, the Court also now finds: (1) that the testimony provided by Defendants' witnesses was credible; and (2) that the testimony presented by Dr. Hilal and Mrs. Zirkel lacked credibility, particularly to the extent it conflicted with the testimony of Defendants' witnesses or relied on assessments that neither Dr. Hilal nor Ms. Zirkel were qualified to make, including any testimony relating to Mr. Zirkel's cognitive abilities.

## III.  DISCUSSION

Defendants urge dismissal of HDS's complaint on the basis that Mr. Zirkel, HDS's corporate representative, and HDS's attorneys have committed fraud upon the Court by initially concealing Mr. Zirkel's illness then using his illness for tactical advantage.  HDS, on the other hand, contends that this is simply a case in which the plaintiff has "proved through uncontradicted evidence and medical testimony [that he has] a serious, debilitating medical condition [which he attempted to use] as a basis for seeking continuance of trial" and that, under these circumstances, dismissal is not an appropriate sanction.  Dkt. 180 at 7.

### A.  LEGAL STANDARD

A "[district] court's power to dismiss is an inherent aspect of its authority to enforce its orders and insure prompt disposition of lawsuits." Goforth v. Owens, 766 F.2d 1533, 1535 (11th Cir. 1985) (citing Link v. Wabash R.R. Co., 370 U.S. 626, 630-31 (1962)).  While

dismissal is a severe sanction and should only be used as a last resort, a district court may impose it upon a finding that the plaintiff has wilfully, or in bad faith, engaged in abusive litigation practices. Vargas v. Peltz, 901 F. Supp. 1572, 1581 (S.D. Fla. 1995) (citing Chambers v. Nasco, Inc., 501 U.S. 32, 44-45 (1991)); see also BankAtlantic v. Blythe Eastman Paine Webber, Inc., 12 F.3d 1045, 1049 (11th Cir. 1994).

Although neither the Supreme Court nor the Eleventh Circuit has set forth a specific test for trial courts to utilize when faced with the question of whether a dismissal with prejudice is the appropriate sanction for a plaintiff who has wilfully, or in bad faith, engaged in abusive litigation practices, courts have considered the following factors: (1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the centrality of the misconduct to the matters at issue in the litigation; (4) the warning given to the offending party that dismissal of the action would be a likely sanction; (5) the public interest in the integrity of the judicial system; and (6) the efficacy of lesser sanctions. See In re AMTRAK "Sunset Ltd." Train Crash, 136 F. Supp. 2d 1251, 1266-67 (S.D. Ala. 2001).[6]

---

[6] Pursuant to Federal Rule of Civil Procedure 16(f), a district court may also sanction a party for failing to comply with a scheduling or pretrial order. Under this rule, "a trial court [is] justified in dismissing [an] action . . . to punish lawyers and parties for conduct which unreasonably delays or otherwise interferes with the expeditious management of trial preparation." Goforth, 766 F.2d at 1535 (citations omitted). The Rule also provides that:

> In lieu of or in addition to any other sanction, the judge shall require the party or the attorney representing the party or both to pay the reasonable expenses incurred because of any noncompliance with this rule, including attorney's fees, unless the judge finds that the noncompliance was substantially justified or that other circumstances make an award of expenses unjust.

**B.  ANALYSIS**

The Court's present inquiry is essentially twofold.  First, the Court must determine whether HDS, through its attorneys and Mr. Zirkel, wilfully, or in bad faith, engaged in abusive litigation practices.  If so, the Court must then determine whether dismissal is an appropriate sanction for HDS's misconduct.

**1.  Whether HDS, through Mr. Zirkel and HDS's attorneys, wilfully, or in bad faith, engaged in abusive litigation practices.**

HDS attempts to characterize this case as merely one in which Mr. Zirkel suddenly fell ill and, as a result, was temporarily unable to continue his participation in this case.  The record, however, tells a decidedly different story.

The facts in this case clearly show that Mr. Zirkel and HDS's attorneys knew of Mr. Zirkel's illness well in advance of the trial.  Indeed, it was nearly a month before trial when Mr. Zirkel and HDS counsel requested a letter from Dr. Hilal detailing Mr. Zirkel's condition, a letter which they intended to use as a basis to continue the case.  And yet, neither Mr. Zirkel nor HDS counsel made any effort to apprise the Court or Defendants of the nature of Mr. Zirkel's illness or the prospect that it might cause an interruption in the proceedings.  As if this omission were not egregious enough, once the Court finally learned of Mr. Zirkel's illness on the brink of Mr. Zirkel's scheduled cross-examination, HDS counsel plainly misrepresented to the Court that Mr. Zirkel's illness was "news" to them.

To make matters worse, the facts in this case also clearly and convincingly evince an intent on the part of HDS counsel and Mr. Zirkel to exploit his illness for strategic advantage.  While Mr. Zirkel undoubtedly suffers from a very serious illness, that illness only became an

issue in this case after HDS counsel bumbled their way through the opening day of trial by improperly referencing Judge Conway and Judge Presnell in HDS's opening statement and by opening the door to cross-examination regarding both HDS's contingency fee and court cost arrangement with HDS counsel and Mr. Zirkel's character.  The Court simply does not believe that it was merely a coincidence that Mr. Zirkel's sudden decline in health followed on the heels of the nearly sanctionable performance of HDS counsel.  After all, Mr. Zirkel had previously demonstrated himself to be perfectly capable of withstanding the burdens of litigation, not to mention running HDS, working 20- to 30-hour work weeks, and judging a Parade of Homes competition.  Perhaps even more telling is the fact that, shortly *after* Mr. Zirkel's illness supposedly rendered him unable to withstand cross-examination, he still had the wherewithal to take an eight-hour car ride to North Carolina and to authorize a settlement agreement.  While HDS's counsel could have requested certain accommodations for Mr. Zirkel's illness, counsel chose instead to characterize his condition as an emergency which made the continuation of the trial–though presumably not a trip to North Carolina or the continued prosecution of other cases–an impossibility.  As defense counsel stated, "It seems as though Mr. Zirkel is as fine as he can be as long as money's coming in.  He can sell his business, he can settle cases, he can take money in; but when he has to prove up his case, he has cognitive disabilities . . . ."   Dkt. 182 at 174.   In view of these facts, the Court concludes that Mr. Zirkel and HDS's counsel acted wilfully and in bad faith both by concealing Mr. Zirkel's illness from the Court and later attempting to use it for strategic advantage.

### 2.  Whether dismissal is an appropriate sanction for HDS's misconduct.

As set forth below, the factors which courts have considered in determining whether

to impose the sanction of dismissal for litigation misconduct plainly weigh in favor of dismissing HDS's complaint with prejudice.

### a. The degree of actual prejudice to Defendants.

The prejudice that Defendants have suffered as a consequence of the misconduct committed by Mr. Zirkel and HDS counsel has been considerable.  Defendants lost the opportunity to take advantage of errors that HDS counsel made on the opening day of trial. Were this case not interrupted, Defendants would not only have had the benefit of a jury which had just been instructed to disregard the improper references of HDS counsel to the federal judiciary, but they also would have been able to inquire into Mr. Zirkel's character and HDS's contingency fee arrangement with HDS counsel on cross-examination.  Defendants also incurred substantial costs in preparation for a trial which, but for the misconduct of Mr. Zirkel and HDS counsel, either would have begun at an appropriate time or never would have been interrupted.  Added to these costs are any costs that Defendants incurred during proceedings related to whether this case should be mistried, continued, or dismissed in light of Mr. Zirkel's unavailability.

### b. The amount of interference with the judicial process.

The interference with the judicial process has been significant.  A jury venire was summoned from various parts of the Orlando Division of the Middle District of Florida.  Some members of the venire traveled approximately two hours to perform their duties for the Court. Those members of the venire who were selected to serve as jurors endured two additional days of travel, only to be discharged because the trial could not proceed.  Additionally, the proceedings associated with the misconduct of Mr. Zirkel and HDS counsel have come at

considerable expense to the Court's time and energy, neither of which the Court can afford to waste given its demanding docket.

**c.  The centrality of the misconduct to the matters at issue in the litigation**.

The misconduct of Mr. Zirkel and HDS counsel was not central to any matters at issue in this case.  Yet, while some cases have emphasized the centrality of the misconduct to the matters in controversy as an important factor in the decision to dismiss,[7] "[f]ederal courts have the inherent power to dismiss an action for misconduct that abuses the judicial process and threatens the integrity of that process–*including misconduct unrelated to the merits of the case.*" Vargas, 901 F. Supp. at 1582 (citing Link, 370 U.S. at 633, where the Supreme Court affirmed the district court's exercise of its inherent power to dismiss claim for failure to appear at a pre-trial conference) (emphasis added).

**d.  The warning given to the offending party that dismissal of the action would be a likely sanction.**

While due process concerns generally militate in favor of warning plaintiffs that their claims may be dismissed if they continue to engage in abusive litigation practices, there was simply no opportunity in this case for the Court to provide any such warning.  Once Mr. Zirkel announced through HDS counsel that he could not continue his participation in the trial, any damage which could have been done to Defendants' case and to the integrity of the Court had already been done.  With Mr. Zirkel and HDS counsel having resolved not to continue the case, any warnings as to the possibility of dismissal would obviously have been moot.

---

[7]  See e.g., Combs v. Rockwell Int'l Corp., 927 F.2d 486, 488 (9th Cir. 1991).

**e.  The efficacy of lesser sanctions.**

The Court has considered other lesser sanctions and has found them inadequate to address the gravity of the misconduct committed by Mr. Zirkel and HDS counsel.  Besides agreeing to absorb some of the costs associated with these proceedings, HDS proposed that the Court read the testimony that Mr. Zirkel provided on direct examination to a new jury. That option, however, would unfairly provide HDS with an opportunity to start over with another jury while requiring Defendants to surrender whatever advantage they may have gained as a result of Mr. Zirkel's live testimony.  The Court is simply unwilling to grant HDS the benefit of its misconduct, particularly not at the expense of Defendants.[8]

**f.  The public interest in the integrity of the judicial system.**

As already noted, the misconduct of Mr. Zirkel and HDS counsel has come at considerable expense to this Court and to Defendants.  Were HDS simply allowed to start over in this case and enjoy the benefit of its abusive litigation practices, the integrity of this Court and of the federal judiciary would greatly suffer.  In contrast, by dismissing this case, future litigants and other members of the public can rest assured that abusive litigation practices will not interfere with this Court's duty to impartially perform its functions.

## IV.  CONCLUSION

For all of the foregoing reasons,  it is **ORDERED** and **ADJUDGED** as follows:

1.  HDS's Renewed Motion for Continuance of Trial, for Mistrial, or Other Relief (Dkt.

---

[8]  It should be noted, in addition, that the Court's first impulse was not to dismiss this case, as was evident from the Court's attempt initially to proceed with trial in the absence of Mr. Zirkel.

161) is **DENIED.**

     2.  Defendants' Motion to Dismiss (Dkt. 167) is **GRANTED** and HDS's claims against

Defendants are **DISMISSED WITH PREJUDICE**.

     3.  The Clerk is directed to enter judgment in favor of Defendants.

     **DONE** and **ORDERED** in Chambers, Orlando, Florida this 30th day of November,

2005.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party